**This order is SIGNED.**

**Dated: May 10, 2022**



*William J. Thurman*

*wtf*

**WILLIAM T. THURMAN**
**U.S. Bankruptcy Judge**

*Order Prepared and Submitted by:*
Brian M. Rothschild, USB #15316
Darren Neilson, USB #15005
**PARSONS BEHLE & LATIMER**
201 South Main Street
Salt Lake City, Utah 84111
Telephone: (801) 532-1234
Facsimile: (801) 536-6111
BRothschild@parsonsbehle.com
DNeilson@parsonsbehle.com

Attorneys for Debtor SoNev Construction LLC

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re:<br><br>SoNev Construction LLC<br><br>     Debtor. | **ORDER (1) AUTHORIZING THE DEBTOR TO OBTAIN POST-PETITION FINANCING; (2) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS AND PRIMING LIENS; (3) AUTHORIZING ADEQUATE PROTECTION PAYMENTS AND USE OF CASH COLLATERAL; (4) SCHEDULING FURTHER HEARING ON ADEQUATE PROTECTION ISSUES; AND (5) GRANTING RELATED RELIEF**<br><br>Case No. 22-bk-21037-WTT<br><br>Chapter 11<br><br>Judge William T. Thurman |

Upon the motion filed at docket no. 5 (the "**Motion**")[1] filed by the above-captioned debtor and debtor-in-possession (the "**Debtor**"), and the Court, finding cause therefore to enter an order (1) authorizing the Debtor to (a) enter into an accounts receivable purchasing facility (the "**DIP Facility**") with nFusion Capital Finance, LLC ("**nFusion**"), (b) enter into the DIP Financing Documents in the form attached as <u>Exhibit A</u> hereto (the "**DIP Financing Documents**"), and (c) take all other actions necessary to consummate the DIP Facility; (2) granting priming liens on all of the Debtor's current and future property as collateral for its obligations under the DIP Facility, with the exception of all existing purchase money security interests on Debtor's equipment and vehicles, and granting superpriority administrative expense claims to further secure such obligations; (3) authorizing the Debtor to use cash collateral and make adequate protection payments to certain secured creditors; (4) scheduling a further hearing on adequate protection; and (5) granting related relief; and the Court, having reviewed the Motion and having heard the statements of counsel in support of the relief requested in the Motion at the hearings[2] before the Court on the matters (collectively, the "**Hearings**"), and no party in interest having filed any objection to the relief requested in the Motion; and upon the record of the proceedings before this Court; and the legal and evidentiary bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein and that such relief is necessary to avoid immediate and irreparable harm to the Debtor's estate,

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

[2] The Court held three hearings on the Motion as follows: (1) March 31, 2022; (2) April 15, 2022, and (3) April 28, 2022.

4869-1060-0990

**THEREFORE, THE COURT HEREBY FINDS AND ORDERS AS FOLLOWS:**

**I.    JURISDICTION AND BASES FOR RELIEF**

1.    The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334.

2.    This is a core matter under 28 U.S.C. § 157(b)(2).

3.    Notice of the Motion and the Hearing are sufficient under the circumstances, and no further notice need be given for the relief sought in the Motion and granted herein.

4.    The statutory predicates for the relief granted herein are sections 363 and 364 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "**Rules**").

**II.    THE DIP FACILITY**

5.    The Debtor is unable to obtain unsecured or secured credit on terms superior to those offered in the proposed DIP Facility and is unable to obtain secured financing without granting the DIP Liens (as defined herein) on a priming basis.

6.    The DIP Liens will not prime the existing lien of any purchase money security interest for any equipment or vehicle financier.

7.    The DIP Facility (a) has been proposed and negotiated in good faith and at arm's length; (b) is necessary in order to preserve the assets of the Debtor's bankruptcy estate; and (c) is fair, reasonable, and adequate under all of the circumstances of this case, and should be approved on a final basis as set forth herein;

8.    The Debtor is authorized on a final basis to enter into the DIP Facility and the DIP Financing Documents, and the Debtor is authorized immediately to execute, deliver and perform under said DIP Financing Documents.  All actions heretofore taken by the Debtor with respect to

3

the negotiation, documentation, and implementation of the DIP Facility are approved on a final

basis with retroactive effect to the Petition Date.

9.      The Debtor is authorized on a final basis to use or sell cash collateral in connection

with the DIP Facility and its operations and to take all other actions necessary to implement the

relief granted in this Order.

10.     The Debtor is authorized, but not required, to sell accounts receivable to nFusion

under the DIP Financing Documents and to use the proceeds of such sales for the purposes as

outlined in the Motion and as approved by other orders of this Court.  As set forth in the DIP

Financing Documents, each sale of an account receivable by the Debtors to nFusion (a) shall

constitute an outright conveyance and true sale, not a loan; (b) shall transfer to nFusion sole and

exclusive ownership of the purchased accounts receivable, free and clear of all liens, claims and

encumbrances of every kind and nature whatsoever, to the maximum extent permissible under

section 363 of the Bankruptcy Code; (c) shall confer on nFusion the immediate right and authority,

without further order of the Court and without seeking relief from the automatic stay, to collect the

purchased accounts receivable for its own account, and the Court hereby modifies the automatic stay

under section 362 of the Bankruptcy Code to the extent required for nFusion to perform any act

authorized by this Order or the DIP Financing Documents; and (d) shall be with full recourse to the

Debtor and the estate, as provided in the DIP Financing Documents.  With regard to the foregoing

clause (c), the Court finds that the requirements of section 363(f) of the Bankruptcy Code are

satisfied with respect to the sale of the Debtor's accounts receivable as contemplated by the DIP

Financing Documents.

11.    To the extent the Debtor becomes indebted to nFusion under the terms of the DIP

Financing Documents due to recourse (chargeback) obligations or otherwise, such indebtedness

(the "**DIP Indebtedness**") shall constitute an allowed superpriority administrative expense claim

having priority under section 364(c)(i) of the Bankruptcy Code over all administrative expense

claims and unsecured claims against the Debtor now existing or hereafter arising, of any kind

whatsoever, including, without limitation, all administrative expense claims of the kind specified

in sections 105, 326, 328, 330, 331, 363, 364, 503, 506, 507, 546, 726, 1113 and 1114 or any other

provision of the Bankruptcy Code or otherwise, as provided under section 364(c)(1) of the

Bankruptcy Code, subject, as to priority only, to any fees payable to the Clerk of the Bankruptcy

Court and to the Office of the United States Trustee pursuant to 28 U.S.C. §1930(a).

12.    To further secure the DIP Indebtedness, (a) nFusion is hereby granted a priming

first-priority lien and security interest in all existing and after acquired personal property of the

Debtor (including without limitation accounts, contract rights, inventory, equipment, and general

intangibles of Debtor and all proceeds thereof) (the "**DIP Liens**"), *provided, however*, that the DIP

Liens shall not prime the perfected purchase money security interests on the Debtor's equipment

and vehicles as set forth in the Motion (the "**Equipment PMSIs**"); and (b) nFusion is immediately

authorized, without further order of the Court and without seeking relief from the automatic stay,

to collect purchased accounts receivable directly from the Debtor's customers and clients, and to

notify such customers and clients to make payment directly to nFusion for such purpose, with the

proceeds of all purchased and non-purchased accounts receivable to be applied as provided in the

DIP Financing Documents.

4869-1060-0990

13.     Notwithstanding anything else herein or anything in the Motion or DIP Financing Documents, nFusion shall be required to seek satisfaction of any DIP Indebtedness first from its purchased receivables and, only after failure to obtain such payment may it look to other assets of the Debtor and its estate.

14.     The Debtor is authorized to perform its obligations to nFusion on the DIP Facility according the DIP Financing Documents, and is authorized to execute such further documents, financing statements, and papers as are reasonable and necessary to effectuate the DIP Facility to the extent not inconsistent with this Order and the DIP Financing Documents.

15.     With respect to the Equipment PMSIs, the requirements of Section 364(d) are inapplicable or satisfied because (a) the DIP Liens are not "senior or equal" to the Equipment PMSIs; and (b) the holders of the Equipment PMSIs shall retain their security interests and relative priorities in and to their collateral.

## III.    ADEQUATE PROTECTION OF CERTAIN SECURED CREDITORS

### A.    Probable Secured Creditors

16.     The Court authorizes the Debtor on a final basis to provide adequate protection payments as and when due under the parties' respective agreements to the following potentially secured creditors:

| Creditor | Collateral | Monthly (or periodic) payment |
|---|---|---|
| Iron Capital Rentals USA | CAT 772G KEX00131: 2014,-CAT0772GHKEX00131 CAT 772G KEX00138: 2014,-CAT0772GCKEX00138 CAT 772G KEX00139: 2014, -CAT0772GVKEX00139 CAT 772G KEX00140: 2014,-CAT0772GJKEX00140 | $67,590.00 |

4869-1060-0990

| | | |
|---|---|---|
| Advantage Leasing/ Associated Bank, N.A./Road Machinery LLC | 1981 Cat 637D with S/N: 27W1414 | $1,372.29 |
| Stearns Bank Equipment Finance | (a) 1998 Cat 824G Bulldozer S/N 4SN00409<br>(b) 2017 CAT RX1575 Trench Roller S/N 5570436<br>(c) 2020 RM MTX60HD Rammer Compactor S/N E-6077 | $3,122.37 |
| U.S. Small Business Administration | General "all assets" UCC-1 | $731.00 |
| Road Machinery LLC/Financial Pacific Leasing | 1979 CAT 637D S/N # 27W1107 | $1,641.54 |
| Komatsu Financial Limited Partnership | Komatsu HB365LC-3 Hydraulic Excavator, S/N# 5190, Quick Coupler, Bucket | $5,855.83 |
| Deere & Company | JOHN DEERE 6210 6210R 210HP TRACTOR S/N: 014806 | $1,306.29 |
| Ford Motor Credit | F150 VIN IFTEW1EP3MF830552 | $780.63 |
| Amur Equipment Finance | (a) D6 GCS900 System; (b) 140 GCS900 System; (c) SPS855 F/R Repeater; (d) SPS855 F/R Repeater | $3,544.42 |
| Balboa Capital | (a) 2010 Mack CXU Lube Truck 1M2AW02C9AN010827<br>(b) 012 INTL TK 4400 Service Truck VIN 3HAMKAAN8CL548097<br>(c) 2007 Ford F750 XL Service Truck<br>(d) 1999 Sterling 2000 Gallon Water Truck<br>(e) 2005 International 9200I Contract #305822-000 | $6,376.49 |

(the "**Probable Secured Creditors**").

17.     The Court finds that the specified payment amounts comprise adequate protection of the Probable Secured Creditors' security interests.  This finding is without prejudice to (a) the Debtor's or any party in interest's right to object to the validity, priority, or extent of any security interest; (b) the Debtor's or any party in interest's right to object to the amount or allowance of any secured or unsecured claim; or (c) the Debtor's or any party in interest's right to assert defenses, setoff, or any other matter respecting any Probable Secured Equipment Creditor's claim. Notwithstanding the authorization, the Debtor is not required to make such payments, but rather, may make such adequate protection payments in its discretion.  Likewise, any Probable Secured Creditor may, upon a change in circumstances, including the Debtor's failure to pay the specified

adequate protection payment, move for relief from stay or for adequate protection of its security interest.

18.     Notwithstanding anything else herein, nothing in the Motion or this Order shall constitute (a) a settlement of any claim or interest by, for, or against the Debtor or any creditor; (b) the assumption, rejection, or assignment of any executory contract; or (c) the adjudication that any equipment or vehicle financing arrangement is a true lease, a true sale, a financing, or otherwise.

### B.     Other Potentially Secured Creditors

19.     The Court authorizes the Debtor solely on an interim basis pending a final hearing as set forth below to provide adequate protection payments to the following potentially secured creditors:

| Creditor | Collateral | Monthly (or periodic) payment |
|---|---|---|
| Michael Conboy | "All Assets" | No payment authorized |
| North Mill Credit Trust | (a) 2005 Caterpillar D9L Crawler Tractor; VIN/Serial #: 14Y75463 2006 Caterpillar 6 13C Water Wagon Scraper; VIN/Serial # CAT0613CV8LJ2343 | $4,984.59 |
| Bill Miller Equip. Sales | CAT D10N DOZER, S/N: 3SK461 | $12,800.00 |
| RPS Campbell Companies, LLC dba Solutions Financial Services | 2018 EDGE STACKER STK 36X80 80' STACKER WITH 40" BELT S/N 18TS8040874, 2019 METSO ST3.8 TRACK SCREEN S/N 180657, AND A 2019 METSO LT1213S IMPACT CRUSHER WITH SCREEN S/N 180186 | $21,000.00 |
| CSC-Amur Equipment Finance | Specific Equipment, 2012 Smithco VIN: 1S9SS4235CL476370 2012 Smithco VIN: 1S9SS4230CL476406 2012 Smithco VIN: 1S9SS274XCL476371 2012 Smithco VIN: 1S9SS2745CL476407 | 1-$34,314.00 60-$3,679.81 |
| Bill Miller Equip. Sales | KENWORTH LUBE TRUCK, S/N: 155231S | $5,000.00 |
| Bill Miller Equip. Sales | KOMATSU PC490 EXCAVATOR, S/N: A41846 | $17,371.00 |
| Hanmi Bank | Specific equipment on Agreement Number # 33753-BRO-45905 PC750 | $3,339.00 |
| KLC Financial, Inc./First Utah Bank | 2002 Cat 988G Wheel Loader S/N# BNH0457 | $5,727.00 |

8

| Garth O Green Enterprises, Inc. dba Southwest Plumbing Supply | All assets | Variable, based on aged payable[3]s |
|---|---|---|
| Komatsu Financial Limited Partnership | PC390LC-10 Hydraulic Excavator S/N A30068 | $2,377.38 |
| Komatsu Financial | Caterpillar D6R Ripper S/N GJB00832 | $3,239.06 |
| Komatsu Financial Limited Partnership | PC 390LC-10 Hydraulic Excavator S/N A30068 Repairs | $3,239.06 |
| Komatsu Financial Limited Partnership | (a) PC360LC-11 Hydraulic Excavator S/N 90859 (b) VT320 Skid Steer Loader S/N GHLVT320A00040580 | (a)  $4,570.34 (b)  $1,316.76 |
| Bill Miller Equipment Sales | Komatsu PC360 Excavator S/N A35517 | $10,000 |
| Caterpillar Financial Services Corporation | (a)140M Cat Motor Grader S/N B9D00399 (b)962M Cat Wheel Loader S/N EJB00517 | $9,501.04 |
| Crestmark Vendor Finance, A Division of Metabank, National Association | 2006 Pioneer PT2650 Crawler Jaw Crasher S/N406796 2001 CAT950G Loader S/N 5PW01787 2001 KOM- Loader S/N WS420H30611 | $13,057.25 |
| Bill Miller | CAT 772 Haul Truck S/N RBL784 | $14,000 |
| Bill Miller | Komatsu PC360 Excavator S/N A36147 | $8,500 |
| Pawnee Leasing/Smarter Equipment Finance LLC | 1979 CAT 6370 S/N 2701290 | $1,369.87 |
| North Mill Credit | 2021 Mega Mac MPT 12Mega Water Tower | $1,406.59 |

(the "**Other Potentially Secured Creditors**").

20.     With respect to the Other Potentially Secured Creditors, the Court finds that additional information and briefing will be necessary to determine whether the Other Potentially Secured Creditors' security interests are validly perfected and therefore entitled to adequate protection payments on a final basis. **The Court will hold a final hearing on the validity of the perfection of the security interests of the Other Potentially Secured Creditors on June 16, 2022, at 2:00 p.m.** (the "**Final Hearing**"). The Final Hearing shall be an evidentiary hearing. The Debtor is directed to submit additional briefing with its contentions on or before June 2, 2022. The additional briefing will include (a) the additional information, security documents, and financing statements required to determine the validity of the security interests; (b) a report showing the

---

[3] The payments to Garth O Green Enterprises, Inc. are authorized hereunder as providing adequate protection and are separately authorized as critical payments by separate motion and order.

4869-1060-0990

Debtor's budget-to-actual performance for the period from the Petition Date through the filing; and its legal authorities supporting its positions with respect to the validity of the Other Potentially Secured Creditors' security interests.  The Debtor is directed to serve this Order and its additional briefing on all of the Other Potentially Secured Creditors, nFusion, the U.S. Trustee, the Subchapter V Trustee, and all parties who have appeared and requested notice in this chapter 11 case.  Any party objecting to or wishing to be heard with respect to the Court's determination at the Final Hearing shall file its objection or brief on or before **June 9, 2022**.  The Debtor may in its discretion file a reply to any objection or brief no later than **June 13, 2022**.

21.     In the interim, the Court authorizes the Debtor solely on an interim basis to pay the proposed adequate protection payments set forth above as and when due under the parties' respective agreements.  The Court finds that the specified payment amounts comprise adequate protection of the Other Potentially Secured Creditors' security interests.  This finding is without prejudice to (a) the Debtor's or any party in interest's right to object to the validity, priority, or extent of any security interest; (b) the Debtor's or any party in interest's right to object to the amount or allowance of any secured or unsecured claim; or (c) the Debtor's or any party in interest's right to assert defenses, setoff, or any other matter respecting any Other Potentially Secured Creditor's claim.  Notwithstanding the authorization, the Debtor is not required to make such payments, but rather, may make such adequate protection payments in its discretion.  Likewise, any Other Potentially Secured Creditors may, upon a change in circumstances, including the Debtor's failure to pay the specified adequate protection payment, move for relief from stay or for adequate protection of its security interest.

4869-1060-0990

22.     Notwithstanding anything else herein, nothing in the Motion or this Order shall constitute (a) a settlement of any claim or interest by, for, or against the Debtor or any creditor; (b) the assumption, rejection, or assignment of any executory contract; or (c) the adjudication that any equipment or vehicle financing arrangement is a true lease, a true sale, a financing, or otherwise.

## IV.    **<u>GENERAL</u>**

23.     Notwithstanding Bankruptcy Rules 4001, 6004, 7062, or 9014, the terms and conditions of this Order shall be immediately effective upon its entry.

24.     The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

###

**[END OF DOCUMENT]**

4869-1060-0990

# Exhibit A

## DEBTOR-IN-POSSESSION ACCOUNT RECEIVABLE PURCHASE AGREEMENT

THIS DEBTOR-IN-POSSESSION ACCOUNT RECEIVABLE PURCHASE AGREEMENT ("Agreement") is by and between SoNev Construction LLC, Debtor-in-Possession (the "CLIENT"), a limited liability company formed under the laws of the State of Nevada, and nFusion Capital Finance, LLC, a limited liability company formed under the laws of the State of Texas (the "NFUSION"); and is subject to the following terms and conditions:

### Recitals

A.   CLIENT is a debtor-in-possession in a bankruptcy case styled *In re SoNev Construction LLC,* Chapter 11 Proceeding, case number 22-21037, pending in the United States Bankruptcy Court for the District of Utah (the "Bankruptcy Case," and the court in which such case is pending, the "Bankruptcy Court").

B.   NFUSION and CLIENT have agreed to enter into this post-petition accounts-receivable purchasing facility up to a maximum amount of TWO MILLION AND 00/100 DOLLARS ($2,000,000) on the terms herein stated and subject to and conditioned upon the entry of an Interim Order and Final Order (defined below) acceptable to NFUSION in its sole discretion.

C.   This Agreement contemplates that CLIENT will sell and assign to NFUSION as absolute owner, with full recourse, certain accounts receivable defined below as the "Accepted Accounts."

NOW THEREFORE, in consideration and furtherance of the foregoing, the parties hereto agree as follow:

1.   **PURPOSE:** CLIENT desires to obtain financing by factoring, selling and assigning to NFUSION acceptable accounts receivable at a discount below the face value. Such financing is subject to the terms and conditions of the Agreement and is commercial in nature, and not for household, family, and/or personal use.

2.   **DEFINITIONS**. The following definitions shall be used in determining the terms of this Agreement. Undefined Capitalized terms shall have the meanings ascribed to them in the Uniform Commercial Code, as in effect from time to time in the State of Texas:
    **"ACCOUNT"** shall have the same meaning ascribed to it in the Uniform Commercial Code as in effect from time to time in the State of Texas; an "Invoice" is the tangible statement of an Account and is interchangeable with "Account" in this Agreement.
    **"ACCEPTABLE ACCOUNT"** means an Account acceptable for purchase as determined by NFUSION, in its discretion, and conforming to the warranties and terms set forth herein and in the applicable Invoice Delivery Schedule.  At a minimum any Acceptable Account (i) must represent goods or merchandise that have been delivered and accepted by the Customer or services that have been fully performed by the CLIENT, and furnished to and accepted by Customer; and (ii) the terms of payment must be no more than thirty (30).
    **"CUSTOMER"** means CLIENT's customer; a Customer is also referred to as an "Account Debtor."
    **"CLIENT"** means the seller and assignor of the Accounts; the CLIENT is a "Debtor" to NFUSION under the Uniform Commercial Code.
    **"COLLATERAL"** shall mean the following described tangible and intangible property of CLIENT: all now owned and hereafter acquired personal property and fixtures of CLIENT, including without limitation Accounts, Chattel Paper, Inventory, Equipment, Instruments (including Promissory Notes), Investment Property, Goods, Documents, General Intangibles, and all of CLIENT's interest in the Reserve Account, together with the proceeds of any of the foregoing (including proceeds of proceeds), and any other property in which CLIENT grants a security interest to NFUSION pursuant to the Transaction Documents.  The Collateral and NFUSION's rights therein and with respect thereto are more fully detailed in the Debtor-in-Possession Security Agreement, between CLIENT and NFUSION of even date herewith.
    **"CREDIT PROBLEM"** means a Customer is unable to pay its debts because of its insolvency, dissolution, termination of existence, business failure, or the filing of any bankruptcy petition or other proceeding of Customer such that payment on the Account is or will be impaired.
    **"CUSTOMER DISPUTE"** means a claim by Customer against CLIENT of any kind whatsoever that reduces the amount collectible from Customer by NFUSION; a Customer Dispute may arise from any kind of disagreement between Customer and CLIENT whatsoever, *valid or invalid,* and may arise at any time,

1

both before and after the signing of this Agreement or the purchase of any Account by NFUSION.

**"INDEBTEDNESS"** or **"OBLIGATIONS"** means all advances, debts, liabilities, loans, obligations, covenants and duties owing by CLIENT to NFUSION, direct or indirect, absolute or contingent, due or to become due, and all principal, interest, charges, costs, expenses and fees (including attorney's fees) owed by CLIENT hereunder or pursuant to any other document or agreement.

**"MATERIAL ADVERSE CHANGE"** means any of the following: (i) a material adverse change in the business, operations, or financial or other condition of CLIENT, or (ii) a material impairment of the prospect of repayment of any portion of the Obligations; or (iii) a material impairment of the value or priority of NFUSION's security interests in the Collateral.

**"PERMITTED LIENS"** – Any and all purchase money security interests with respect to CLIENT's equipment existing as of the Effective Date.

**"REPURCHASE PRICE"** with respect to any factored Account at any time, the sum of (a) the then-unpaid face amount of such factored Account and (b) all then-outstanding discounts, fees, expenses, and other Obligations relating to such Account.

**"TRANSACTION DOCUMENTS"** - this Agreement and all other agreements, certificates, instruments, and other documents of whatever nature executed or delivered in connection with this Agreement.

3. **REPRESENTATIONS, WARRANTIES, & DISCLOSURES.** As an inducement for NFUSION to enter into this Agreement, CLIENT hereby incorporates by reference each representation and warranty included in each Invoice Delivery Schedule executed by CLIENT and, with the full knowledge that NFUSION is relying upon the truth and accuracy of these statements, CLIENT further represents that

(a) <u>TAXES</u>: CLIENT has made and shall continue to make timely payment of all required state and federal taxes; CLIENT agrees to provide to NFUSION proof of payment and/or compliance of all taxes required by law and to notify NFUSION of any levy issued against CLIENT;

(b) <u>INSURANCE</u>: CLIENT will maintain such insurance covering CLIENT's business and/or the property of Customers as is customary or required, and will name NFUSION as loss payee of such insurance;

(c) <u>RECORDS</u>: All financial records, accounts, statements, books, or documents shown to NFUSION by CLIENT at any time are true, complete, accurate, and represent the true financial condition of CLIENT; CLIENT agrees to furnish NFUSION financial statements upon request;

(d) <u>CHANGES IN BUSINESS</u>: CLIENT will notify NFUSION in writing prior to any change in the location of CLIENT's state of registration and/or principal place of business; the location where CLIENT's books and records concerning Accounts are kept; the CLIENT's name, identity, legal entity or structure whether by merger, acquisition, or sale of substantially all of CLIENT's assets; use of trade name(s); and/or any proposed change in any of the officer, principals, managers, directors, partners, and/or owners of the CLIENT;

(e) <u>CUSTOMER CREDIT</u>: Each Customer's business is solvent to the best of CLIENT's information and knowledge, and CLIENT has not received any notice, verbal or written, of a Credit Problem concerning any Customer that has not been disclosed to NFUSION in writing;

(f) <u>NO ASSIGNMENT</u>: CLIENT shall not assign this Agreement to any person or business under any circumstance.

(g) <u>CUSTOMER TERMS</u>: CLIENT will not modify any term of its Accounts with any Customer unless NFUSION first consents in writing;

(h) <u>TITLE/NO FURTHER SALES</u>: CLIENT is the lawful owner of, and has undisputed title to, the Accounts sold to NFUSION by CLIENT; CLIENT will not factor, sell, pledge or assign Accounts except to NFUSION for the period of this Agreement and for as long as any Account remains unpaid to NFUSION by CLIENT or any Customer;

(i) <u>NOTICE TO CUSTOMERS</u>: CLIENT shall notify all Customers that the Accounts have been assigned to NFUSION. All Customer Invoices shall have imprinted upon them a notation notifying the Customer that the Accounts have been assigned to NFUSION and payment is required to be made to NFUSION at the remittance address required by NFUSION (the "<u>Notation</u>").

(j) <u>SECURITY</u>: CLIENT has not transferred, pledged or granted a security interest in the Collateral described below to any party not disclosed in writing to NFUSION; CLIENT will not transfer, pledge, or grant a security interest or lien to any other party in the Collateral described below for the term of this Agreement and for so long as any Account remains unpaid to NFUSION by CLIENT or any Customer.

(k) <u>ACCOUNT PURCHASE TRANSACTION</u>. The parties agree and acknowledge that the payments contemplated by this Agreement do not constitute payments for the use, forbearance, or detention of

money. All transactions contemplated hereby are account purchase transactions as defined in Section 306.001 and Section 306.103 of the Texas Finance Code. The purchase of the Accounts by NFUSION constitutes an outright conveyance and true sale of Accounts by CLIENT to NFUSION. The Factoring Fees, and other discounts, fees or charges hereunder, are intended by the parties as "discounts" under Section 306.103 of the Texas Finance Code.

(l) <u>REPORTING REQUIREMENTS</u>. CLIENT shall provide NFUSION with all financial and other information reasonably requested by NFUSION, including, without limitation, granting NFUSION online access to monitor the following: (i) financial reporting system; (ii) payment of federal and state taxes; (iii) deposit accounts; (iv) and (v) Customer portals.

4. **SECURITY INTEREST IN COLLATERAL.** In order to secure the Obligations, CLIENT grants to NFUSION a security interest and lien upon the Collateral, and as a condition precedent to the purchase of any Account by NFUSION hereunder, NFUSION shall require a security interest in and lien upon the Collateral ("<u>DIP Liens</u>"), which, pursuant to U.S.C. 364(c) and (d), shall be valid and perfected priming liens, and first and senior in priority to all other interests and liens of every kind, nature, and description, whether created consensually, by an order of the Bankruptcy Court, or otherwise, other than the Permitted Liens. This Agreement is subject to and shall only become effective upon the Bankruptcy Court's granting an allowed super-priority administrative claim to NFUSION for the Obligations, pursuant to Section 364(c)(1) of the Bankruptcy Code (the "<u>Superpriority Claim</u>"), having priority in right of payment over any and all other obligations, liabilities, and indebtedness of CLIENT, whether now in existence or incurred by CLIENT after the Petition Date, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, *inter alia,* Sections 105, 326, 328, 330, 331, 503(b), 507(a), 364(c)(1), 564(c), 726, or 114 of the Bankruptcy Code. Notwithstanding the granting to NFUSION of a security interest, it is acknowledged that Accounts purchased by NFUSION are the sole property of NFUSION, and as such, are not Collateral. All purchases hereunder are conditioned upon a Bankruptcy Court order allowing the sale of accounts free and clear of any pre-existing liens or security interests, providing that the purchase of Accounts by NFUSION under the Agreement is in good faith and NFUSION is a good faith buyer within the meaning of Bankruptcy Code section 363(m), and providing that because NFUSION has proceeded in good faith in all respects in connection with the CLIENT's Chapter 11 case, it is entitled to all of the protections afforded by Bankruptcy Code sections 363(m) and 364(e).

5. **SALE/ASSIGNMENT/NOTIFICATION.**

(a) <u>APPROVAL</u>: CLIENT shall from time to time sell, transfer, or assign Accounts to NFUSION subject to NFUSION's instructions and approval. Accounts shall be identified by separate and subsequent bills of sale on forms known as Invoice Delivery Schedules; CLIENT must supply NFUSION with original invoices, inclusive of supporting documents required for payment, and true and accurate copies of the same. NFUSION will not purchase an Account unless CLIENT first submits such Account to NFUSION for approval.

(b) <u>USE OF PURCHASE FUNDS</u>. The purchase funds paid to CLIENT shall only be used in accordance with a budget to be pre-approved by NFUSION, in its reasonable discretion (the "<u>DIP Budget</u>"), an interim order entered by the Bankruptcy Court approving the Agreement (the "<u>Interim Order</u>), or a final order entered by the Bankruptcy Court (the "<u>Final Order</u>"), as applicable, and the Agreement. Specifically, the purchase funds shall be used: (a) for working capital and general corporate purposes of CLIENT, as specified in the DIP Budget; and (b) to pay the Origination Fee, NFUSION'S legal and other professional fees reasonably incurred in connection with the Agreement and any other Transaction Document, and other fees or charges accruing under the Agreement.

(c) <u>NO OBLIGATION</u>: NFUSION is not obligated to buy any Account from CLIENT and shall have no liability to CLIENT, any Customer, or any supplier of CLIENT for NFUSION's failure or refusal to purchase an Account.

(d) <u>COLLATERAL ASSIGNMENT OF ALL INVOICES</u>: CLIENT hereby assigns to NFUSION all accounts of CLIENT; all monies due to CLIENT are hereby due and payable only to NFUSION; CLIENT may not terminate or modify this assignment without NFUSION's written consent in the form of a release letter signed by NFUSION; NFUSION shall release the assignment if and only if all obligations and indebtedness owed by CLIENT to NFUSION are fully discharged and paid in full or, in NFUSION's sole discretion, a partial release of the assignment pertaining to a specific Customer is issued by NFUSION in a separate writing.

(e) <u>AUTHORITY</u>: NFUSION shall have the right to, in CLIENT'S name or in NFUSION's name, whether CLIENT is in default of this Agreement or not, demand, sue for, collect, settle, and give releases for

3

any and all monies due or to become due on the Collateral.

(f) <u>NOTIFICATION</u>:   NFUSION will, at any time within its discretion, notify any Customer to make payment(s) directly to NFUSION, and CLIENT waives and forever releases NFUSION and all of its officers, directors, employees, managers, members, agents and representatives, from and against any claims arising from such communications, including, without limitation, claims for intentional interference with existing or future contracts.

(g) <u>SOLE PROPERTY</u>: Once NFUSION has purchased an Account, the Account is the *sole and exclusive property* of NFUSION. CLIENT shall make proper entries on its books and records disclosing the absolute sale of the Account to NFUSION.

(h) <u>ALL ACCOUNT PROCEEDS TO BE REMITTED TO NFUSION LOCKBOX</u>.  CLIENT agrees that any and all Accounts, whether purchased or Collateral or NFUSION, must be collected through the lockbox arrangements established by NFUSION (the "<u>Lockbox</u>").  CLIENT shall notify all Customers to make all payments to the Lockbox.  CLIENT's invoices shall have imprinted or stamped on the face thereof notifications of assignment and check remittance information indicating NFUSION'S Lockbox address.  NFUSION may also directly notify all Customers to make all payments to such Lockbox.  In the event any payments on, and proceeds of, Accounts are received by CLIENT, CLIENT shall hold such funds in trust for NFUSION, and CLIENT shall immediately deliver all such payments and proceeds to NFUSION in their original form, duly endorsed, to be applied to the Obligations in such order as NFUSION shall determine.

6. **<u>MAXIMUM ACCOUNT LIMIT, FEES, & CHARGES/FUEL ADVANCES</u>:** NFUSION agrees to buy from CLIENT CLIENT Acceptable Accounts, at a discount, that have been approved by NFUSION for purchase from CLIENT, subject to the limits, fees, and charges described in this Agreement. Any sale of Acceptable Accounts under this Section 6 shall be within NFUSION's sole discretion and with <u>full recourse</u> against CLIENT.  All Accounts offered for purchase by CLIENT will be subject to NFUSION's credit review, concentration limits, and cross-age testing.  The maximum amount of outstanding Accounts purchased by NFUSION shall not exceed the sum of $2,000,000 (the "Maximum Amount") at any given time.

(a) <u>FACTORING FEE</u>: CLIENT agrees to pay to NFUSION an Initial Factoring Fee equal to 2.25 % of the face value of each Account purchased, payable from amounts paid to CLIENT for the purchase of each Account.  In addition, CLIENT agrees to pay NFUSION an Additional Factoring Fee of 0.75 % of the face value of each purchased Account for every 10 day period, or portion thereof, that the Account remains unpaid to NFUSION beyond 30 days from the purchase date.

(b) <u>RESERVE  & RESERVE DISBURSEMENTS</u>: NFUSION will reserve and withhold  from each Account purchase an amount equal to 20.00% ("<u>Reserve Percentage</u>") of the face amount of the Account (less any retainage) to secure the repayment of all Indebtedness and Obligations owing to NFUSION. NFUSION may charge this reserve account (the "<u>Reserve</u>" or "<u>Reserve Account</u>") for any and all amounts owed by CLIENT to NFUSION, including, without limitation, the Factoring Fee, Account charge-backs or Indebtedness of CLIENT to NFUSION, known or anticipated, and the Reserve is not due and payable to CLIENT until any and all such obligations and indebtedness arising hereunder are paid in full.  If there are no outstanding Obligations of CLIENT to NFUSION, known or anticipated, NFUSION will return to CLIENT from the Reserve the unpaid purchase price of any individual Account within three business days of the payment in full of such Account (or such longer period of time, in NFUSION's discretion upon notice to CLIENT). The Reserve shall be a book balance maintained on the records of NFUSION and shall not be a segregated fund.

(c) <u>CHARGES</u>:  NFUSION will deduct wire transfer fees or courier charges (at NFUSION's standard rate), if used by CLIENT, from each advance hereunder or shall charge such expenses to the Reserve.

(d) <u>OTHER FEES</u>:
   - <u>Termination Fee</u>: *See Section 12, below.*
   - <u>Misdirected Payment Fee</u>: Fifteen percent (15%) of the amount of any payment on any Account which is received by Seller and not delivered in kind to NFUSION by the next business day following the date of receipt by CLIENT, payable on demand.
   - <u>Missing Notation Fee</u>: Fifteen percent (15%) of the face amount of any Invoice issued to a Customer without the Notation, payable on demand.
   - <u>Origination Fee</u>: A fee in the amount of 1.00 % of the Maximum Amount, due and payable at the execution and upon each anniversary date of this Agreement.

4

- Overadvance Fee: 0.16959% per day on any amount exceeding the Reserve Percentage multiplied by the unpaid            balance of purchased Accounts.
- Monthly lock box fee:  $50.00
- Wire fee:  $25.00
- ACH/Fuel Card fee:  $5.00
- Monthly UCC fee:  $10.00
- Monthly Tax monitoring fee:  $21.67
- Collection fees:  Any incurred costs or expenses associated with collections of Accounts (including, without limitation, attorneys' fees and court costs incurred by NFUSION in the enforcement of its rights in any Account).
- Fuel Advance Fee: See Section 6(e), below.
- Vendor Price Fluctuations. NFUSION reserves the right to change any of the above fees to reflect vendor price fluctuations.

(e) Advances for Fuel Purchases.  To facilitate CLIENT'S ability to ship and deliver goods on behalf of its Customers, and subject to the terms of the Agreement, upon CLIENT'S request, NFUSION (in its sole and absolute discretion) may advance a portion of the purchase price of a contemplated Account to CLIENT, which funds CLIENT agrees to use only for the purchase of fuel needed to fulfill a Customer Order (as hereinafter defined).  Advances under this Section 6(e) ("Fuel Advances") are conditioned upon: (i) CLIENT taking possession of the subject goods and (ii) NFUSION receiving from CLIENT a rate sheet or service order from the Customer concerning the shipment of the goods (the "Customer Order"), in form acceptable to NFUSION, containing at a minimum, the following required terms: description of goods to be delivered, the expected delivery time-frame and the price payable to CLIENT for the delivery.  Advances under this Section 6(e) shall be in amounts of no more than 40.00% of the subject Customer Order.  Upon NFUSION's payment of a Fuel Advance with respect to any Customer Order, NFUSION shall be deemed to have purchased, and CLIENT shall be deemed to have sold to NFUSION, all Accounts and payment rights associated with the Customer Order.  Fuel Advances shall accrue a one-time factoring discount fee ("Fuel Advance Fee") of 1.5% of the Customer Order.  The Fuel Advance Fee shall accrue upon payment of the Fuel Advance to CLIENT, and shall be payable to NFUSION, along with the Fuel Advance: (i) from purchase funds owed to CLIENT at the time the associated Account is sold to NFUSION, or (ii) upon demand, at NFUSION's discretion.  All Accounts generated from Customer Orders for which Fuel Advances have been paid by NFUSION shall be offered for sale to NFUSION (without limiting NFUSION's discretion to purchase such Account).  Purchase funds payable to CLIENT for the purchase of any such Accounts shall first be applied and used to satisfy in full all amounts owed by CLIENT under this Section 6(e), including the Fuel Advance and the Fuel Advance Fees.  NFUSION shall have the option of either paying the Fuel Advance directly to CLIENT or as a credit to the CLIENT'S fuel card account.  CLIENT represents and warrants that every Fuel Advance shall be used to pay for the fuel associated with the subject Customer Order and failure to so apply any Fuel Advance shall be an Event of Default under this Agreement.

7. **FULL RECOURSE, DISPUTES & CHARGEBACKS:**
(a) FULL RECOURSE: NFUSION will have full recourse against CLIENT when an Account is not paid by Customer when due.  Any Account not paid within sixty (60) days of the Invoice date shall be immediately, without the need for demand or notice, repurchased by CLIENT at the Repurchase Price.  At NFUSION's option, the Repurchase Price shall be charged against the Reserve; provided, however, that title to the Account shall not transfer to Client until the Repurchase Price has been fully and indefeasibly paid in cash to NFUSION.  All Accounts repurchased by CLIENT shall continue to be Collateral securing the obligations of CLIENT to NFUSION.
(b) DISPUTES: CLIENT will immediately notify NFUSION of any dispute between Customer and CLIENT and shall pay to NFUSION the full amount of any Account subject to the Customer Dispute.  Mistaken, incorrect, or erroneous Invoices submitted by CLIENT to NFUSION may be, at NFUSION's discretion, deemed subject to a Customer Dispute.

8. **COLLECTION/PAYMENTS:** NFUSION shall collect payment directly from Customers on *all* CLIENT Accounts, regardless of whether such Account has been purchased or factored by NFUSION.  Such amounts shall be credited to CLIENT's Reserve Account and any disbursements thereof to CLIENT shall be subject to Section 6(b) of this Agreement.
(a) HOLD HARMLESS: CLIENT shall hold NFUSION harmless against any claim, cause of action, liability in tort, contract, or equity, or Customer ill-will arising from NFUSION's collecting or

5

attempting to collect any Account(s).

(b) <u>HOLD IN TRUST</u>: It is agreed and understood that all Customer payments are required to be remitted directly by the Customer to the Lockbox. If any payment is received by CLIENT on an Account, CLIENT will hold such payment in trust, for the benefit of NFUSION, and immediately turn over to NFUSION the identical check or other form of payment received, whether or not the payment includes payment on Accounts not purchased by NFUSION.

(c) <u>DOUBLE PAYMENTS & NON-FACTORED ACCOUNTS</u>: NFUSION may, in its sole discretion, carry unidentified, duplicate, or payments on non-factored Accounts as open accounting entries and return said payments to the payor or, in the case of non-factored payments only, forward the payment to CLIENT upon proper identification, subject to any outstanding obligations or charge-backs due NFUSION, subject to Section 6(b) of this Agreement.

(d) <u>CLEARANCE DAYS</u>: For purposes of applying Customer or CLIENT payments three (3) business days will be added to the date on which NFUSION receives any payment.

9. **POWER OF ATTORNEY:** In order to carry out this Agreement, CLIENT irrevocably appoints NFUSION or any person designated by NFUSION, its special attorney-in-fact, or agent, whose authority granted should remain in full force and effect until all Accounts are paid in full and all Obligations of CLIENT to NFUSION is discharged, with power to:

(a) Notify Customers that CLIENT'S Accounts have been sold and assigned to NFUSION;

(b) Direct CLIENT'S Customers to make payment of all Accounts directly to NFUSION and forward invoices directly to such Customers;

(c) Strike out CLIENT'S address on all Accounts mailed to Customers and put NFUSION's address on all Accounts;

(d) Receive, open and dispose of all mail addressed to CLIENT via NFUSION's address;

(e) Endorse the name(s) of CLIENT on any checks or other evidences of payment that may come into the possession of NFUSION on all Accounts and any other documents relating to any of the Accounts or to Collateral;

(f) In CLIENT'S name(s), or otherwise, demand, sue for, settle, collect, and give releases for any and all monies due or to become due on Accounts;

(g) Compromise, settle, prosecute, file mechanics or other statutory liens or defend any action, claim or proceeding as to said Accounts;

(h) From time to time offer trade discounts to CLIENT'S customer in addition to CLIENT'S normal business discounts with said Customer;

(i) Upon any Event of Default, to direct any financial institution or bank which is the institution with which any deposit account is maintained by CLIENT, to pay to NFUSION all moneys on deposits by CLIENT, which are payable by said institution to CLIENT regardless of any loss of interest, charge, or penalty as a result of payment before maturity; and

(j) Do any and all things necessary and proper to carry out the purpose intended by this Agreement and to protect CLIENT'S and NFUSION's interest in the Accounts or other Collateral.

This foregoing powers are irrevocable and coupled with an interest.

10. **DEFAULT:** Any one or more of the following shall be a default hereunder:

(a) CLIENT shall fail to pay any Obligation to NFUSION when due;

(b) CLIENT shall breach any term, provision, covenant, warranty or representation contained in this Agreement or an Invoice Delivery Schedule;

(c) Any documentation, report or other statement made by CLIENT to NFUSION shall be false, erroneous, or misleading in any respect;

(d) Any involuntary petition in bankruptcy shall be filed against CLIENT;

(e) Any judgment, levies of attachment, executions, tax assessments or similar process shall be issued against CLIENT or any of the Collateral;

(f) CLIENT shall cease offering Accounts to NFUSION for purchase while factored Accounts remain outstanding, the collectability of which is uncertain, in whole or part, as determined by NFUSION in its sole discretion;

(g) CLIENT, without prior notice or disclosure to NFUSION, terminates, discontinues or suspends the

operations of its business or the occurrence of a Material Adverse Change;

(h) CLIENT shall file or otherwise support a motion, or other pleading, seeking conversion or dismissal of the Bankruptcy Case;

(i) The appointment of a Trustee in the Bankruptcy Case;

(j) Entry of an order authorizing the obtaining of credit or the incurrence of indebtedness by CLIENT that is secured by a security interest in or lien on any or all of the Collateral, which is senior or *pari passu* with the security interest and liens against the Collateral granted to NFUSION; (l) the existence of any other superpriority administrative expense claim senior to or *pari passu* with the DIP Liens and superpriority administrative claim granted to NFUSION;

(k) Entry of an order under Bankruptcy Code §506(c) surcharging the Collateral;

(l) Entry of an order without the prior consent of NFUSION amending, supplementing or otherwise modifying the Interim Order or Final Order, or any other order the amendment, supplementation or modification of which could reasonably be expected to result in a Material Adverse Change;

(m) The reversal, vacation or stay of the effectiveness of the Interim or Final Order, or any other Order the reversal, vacation or stay of which could reasonably be expected to result in a Material Adverse Change;

(n) Any sale of all or substantially all of CLIENT'S assets that does not pay the Obligations to NFUSION in full, in cash on a final and indefeasible basis with all commitments terminated;

(o) Entry of an order approving the sale of the Collateral or approving procedures regarding the same, and filing any plan or disclosure statement or supplements or amendments thereto, or any orders approving or amending any of the foregoing, that are not in form and substance reasonably acceptable to NFUSION; and

(p) Granting of relief from the automatic stay to any party to permit foreclosure or enforcement on any assets which are subject to the DIP Liens.

11. **REMEDIES AFTER DEFAULT:** In the event of a default, NFUSION may do any one or more of the following without notice or demand to CLIENT except as expressly required under this Agreement:

(a) require the immediate repurchase of all outstanding factored Accounts;

(b) declare any and all indebtedness immediately due and payable in full;

(c) notify any Customers and take possession of Collateral and collect any Accounts without judicial process;

(d) take control in any manner of any goods, equipment, inventory or other personal property relating to any Account;

(e) direct any financial institution or bank which is the institution with which any deposit account is maintained by CLIENT, to pay to NFUSION all moneys on deposit by CLIENT, which are payable by said institution to CLIENT;

(f) require CLIENT to assemble the Collateral and records pertaining to Accounts and deliver them to NFUSION's offices;

(g) exercise all or any of the rights and remedies of a secured creditor under the Uniform Commercial Code or any other applicable law or at equity;

(h) grant extensions, compromise claims and settle Accounts for less than face value, without prior notice to CLIENT;

(i) hold CLIENT liable for any deficiency; and

(j) charge interest on any indebtedness outstanding at the highest rate permitted by law, which interest shall become part of the indebtedness.

Other than in connection with a good faith claim over the existence of an Event of Default, CLIENT waives any and all rights to seek injunctive relief in the Bankruptcy Case or other proceeding to dispute, stay or delay any of the foregoing remedies.

12. **CONTRACT TERM:** This Agreement becomes effective when it is accepted and executed by an authorized representative of NFUSION. The Agreement shall be for an initial term of twenty-four (24) months from the date of acceptance by NFUSION, and shall automatically renew for successive twenty-four (24) month terms unless NFUSION receives written notice of non-renewal from CLIENT at least ninety days prior to the expiration of the term. This Agreement may be terminated by NFUSION: (a) at any time upon thirty days prior written notice to CLIENT; or (b) if an Event of Default has occurred and is continuing, upon written notice to CLIENT, in which case, such termination shall be effective immediately

7

upon the delivery of such notice (or any later date and time specified in such notice). Despite termination, NFUSION shall continue to have a security interest in the Collateral of CLIENT until all outstanding factored Accounts and all Obligations of CLIENT to NFUSION are paid in full.  CLIENT shall pay NFUSION a Termination Fee of equal the greater of $5,000 or the amount of the Factoring Fees, and other discounts, fees or charges that accrue during the ninety-day period prior to the effective termination date if CLIENT terminates the Agreement  prior to the expiration of a term, or the Agreement is terminated by NFUSION as a result of an Event of Default. Client hereby acknowledges and agrees that NFUSION will incur significant time and expense setting up this financing relationship (the "Due Diligence Expenses"). In the event that NFUSION does not purchase any Accounts from Client under this Agreement for any reason out of the control of Factor (including, but not limited to, the inability of Client to completely terminate its relationship with any other financing company), Client hereby agrees to pay NFUSION a fee equal to $5,000 to compensate NFUSION for the Due Diligence Expenses, which amount shall be in addition to any deposit or other funds paid to NFUSION prior to the execution of this Agreement.

13. **MERGER, INTERPRETATION, LEGAL FEES, & OTHER RIGHTS:** This Agreement together with each Invoice Delivery Schedule contains the entire Agreement between the parties and any modification hereto must be signed by CLIENT and NFUSION.  CLIENT disclaims the existence of, or reliance upon, any oral representation by NFUSION. This Agreement inures to the benefit of and is binding upon the heirs, executors, administrators, successors and permitted assigns of the parties and may not be assigned by CLIENT without NFUSION's prior written consent.

   (a) LEGAL FEES: Except as prohibited by law, CLIENT shall pay to NFUSION all costs and expenses, including, without limitation, attorneys' fees and costs incurred by NFUSION in the enforcement of any of NFUSION'S rights or claims pertaining to this Agreement and any Obligations of CLIENT to NFUSION.  CLIENT shall pay such amounts on demand after notice by NFUSION.

   (b) SEVERABILITY: If any provision of this Agreement shall be declared illegal or contrary to law, it is agreed that such provision shall be disregarded and this Agreement shall continue in force as though such provision had not been incorporated  herein.

   (c) CUMULATIVE  RIGHTS: All rights, remedies and powers granted to NFUSION in this Agreement, or in any note or other agreement between CLIENT and NFUSION or executed in connection herewith, are cumulative and may be exercised singularly or concurrently with such other rights as NFUSION may have and from time to time as to all or any part of the pledged Collateral as NFUSION in its discretion may determine.

14. **INDEMNIFICATION:** CLIENT agrees to indemnify and hold NFUSION harmless from any and all liability, obligations, claims, losses, damages, actions  and suits, including counsel fees, costs of suit and interest which NFUSION  may incur in any way relating to or resulting from  this Agreement (including as a result of CLIENT's failure to pay withholding taxes due and payable to any taxing authority); provided that this indemnity clause shall not apply to any liability that is the direct result of NFUSION's gross negligence or willful misconduct.

15. **FIDUCIARY DUTY:** CLIENT understands and agrees that *neither* this Agreement nor any transaction or any totality of circumstances related hereto and/or arising hereunder creates a fiduciary duty owed by NFUSION to CLIENT and that NFUSION owes no fiduciary duty to CLIENT whatsoever. The foregoing notwithstanding, CLIENT owes NFUSION fiduciary duties with respect to Account proceeds and Customer payments received by CLIENT.

16. **CHOICE OF LAW & JURISDICTION:** This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. **CLIENT CONSENTS TO THE EXCLUSIVE PERSONAL JURISDICTION AND VENUE OF THE LOCAL, STATE, OR FEDERAL COURTS LOCATED WITHIN TRAVIS COUNTY, TEXAS AND EXPRESSLY WAIVES ANY RIGHT TO OBJECT TO THE FORUM AS AN INCONVENIENT FORUM *(FORUM NON CONVENIENS).***

17. **MUTUAL WAIVER OF RIGHT TO JURY TRIAL: BOTH CLIENT AND NFUSION ACKNOWLEDGE THE EXTREME COSTS ATTENDANT TO TRIAL BY JURY, AND THEREFORE BOTH CLIENT AND NFUSION WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM, OR COUNTERCLAIM, WHETHER IN CONTRACT OR TORT, AT LAW OR IN EQUITY, ARISING OUT OF OR IN ANYWAY RELATED TO THIS AGREEMENT.**

18. **CONDITIONS PRECEDENT.**

(a) CLIENT acknowledges and represents as follows: (i) on March 25, 2022 (the "Petition Date"), CLIENT filed a voluntary chapter 11 petition in the Bankruptcy Court, commencing the Bankruptcy Case; and (ii) CLIENT has retained possession of its assets and is authorized to continue in the operation and management of its business. No later than _____ (___) business days following the date of the Agreement, CLIENT shall file a motion in the Bankruptcy Case, seeking the Bankruptcy Court's approval of the Agreement (the "Motion"). If CLIENT has not filed the Motion within the _____ (___) day period, the Agreement shall be null and void and of no further effect. Other than the provisions of this Section 18, the Agreement is subject to the prior approval of the Bankruptcy Court. The term "Effective Date," as defined herein, means the date on which the Bankruptcy Court enters the Interim Order granting the Motion or otherwise authorizing CLIENT to execute and perform under the Agreement; provided, however, that if it appears that the Final Order may be appealed by any party, NFUSION may, by written notice to CLIENT, delay the Effective Date until the subject Order has become final and unappealable. If, as of _____, the Bankruptcy Court has not entered the Interim Order, the Agreement shall be null and void for all purposes, and no party shall have any further obligation hereunder. The Agreement shall be subject to the negotiation, execution and delivery of ancillary closing documents, including guarantee agreements, security documents and other supporting instruments and agreements embodying the terms set forth herein reasonably satisfactory to the CLIENT and NFUSION, and each of the foregoing shall contain terms and conditions customary in debtor-in-possession financing agreements, consistent with CLIENT'S rights and obligations as debtor-in-possession.

(b) Any and all purchases made hereunder are subject to the following conditions precedent: (i) CLIENT and each Guarantor shall have executed and delivered all required Transaction Documents to NFUSION; (ii) CLIENT shall have delivered the DIP Budget that is satisfactory to NFUSION in all respects; (iii) NFUSION shall have first priority, perfected priming liens and security interest in all Collateral, except as expressly provided otherwise in the description of the DIP Liens and the Collateral above, subject only to the Permitted Liens; (iv) all fees, cost and expenses (including the Origination Fee when due, and costs and expenses of counsel and/or other professionals) required to be paid to NFUSION shall have been paid (which condition may be satisfied with the proceeds of advances hereunder); (v) all orders, including the Interim and Final Orders, entered by the Bankruptcy Court in the Bankruptcy Case from the date of the filing of the motion to approve the Agreement (the "DIP Motion Date") shall be in form and substance reasonably satisfactory to NFUSION, and with respect to the Interim and Final Orders shall include findings that NFUSION is entitled to the protections of Bankruptcy Code Sections 364(e) and 363(m) as NFUSION has negotiated with CLIENT and has entered into the Transaction Documents in good faith; (vi) all motions and other documents to be filed and submitted to the Bankruptcy Court in connection with the Agreement, and the approval thereof shall be in form and substance reasonably satisfactory to NFUSION; (vii) the Bankruptcy Court shall have entered the Interim Order within _____ (___) business days following the DIP Motion Date, in form and substance satisfactory to NFUSION, (x) authorizing and approving the Agreement and the transactions contemplated thereby and hereby, including, without limitation, the granting of the super-priority status, security interest and priming liens, and the payment of all fees, (y) providing that the DIP Liens are automatically perfected (except as limited by non-bankruptcy law with respect to any guarantors), and (z) lifting or modifying the automatic stay to permit CLIENT to perform its respective obligations and NFUSION to exercise its rights and remedies with respect to the Agreement; and (viii) other customary conditions, including satisfactory completion of NFUSION'S diligence, as may be required by NFUSION.Waiver/Modification of Automatic Stay.

(c) CLIENT shall seek an Interim Order which provides that the automatic stay provisions of Section 362 of the Bankruptcy Code and any other restrictions imposed by an order of the Court or applicable law be modified and vacated without further notice, application or order of the Court to the extent necessary to permit NFUSION to perform any act authorized or permitted under or by virtue of the Interim Order, Final Order or the Agreement and any other Transaction Documents, as applicable, including, without limitation, (i) to implement the post-petition financing arrangements authorized by the Interim Order and/or Final Order and pursuant to the terms of the Transaction Documents, including payment of the fees thereunder, and direct collection of the CLIENT' Accounts from Customers, and (2) to take any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the Collateral.

[Execution page follows]

*Each person signing this Agreement represents and warrants that he or she is duly authorized and has legal capacity to execute and deliver this Agreement, that the execution and delivery of the Agreement and the performance of such party's obligations hereunder have been duly authorized, and that the Agreement is a valid and legal agreement binding on such party and enforceable in accordance with its terms.*

**EXECUTED AND AGREED BY THE UNDERSIGNED:**

| | |
|---|---|
| **CLIENT:** | **NFUSION:** |
| **SONEV CONSTRUCTION LLC** | **NFUSION CAPITAL FINANCE, LLC** |
| **By:** _____ | **By:** _____ |
| **Name: Keith Gilbert** | **Name:  Jason R. Lippman** |
| **Title:** | **Title: CEO** |
| **Date:** | **Date:  4/1/2022** |

10

## DESIGNATION OF PARTIES TO RECEIVE NOTICE

Service of the foregoing **ORDER (1) AUTHORIZING THE DEBTOR TO OBTAIN POST-PETITION FINANCING; (2) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS AND PRIMING LIENS; (3) AUTHORIZING ADEQUATE PROTECTION PAYMENTS AND USE OF CASH COLLATERAL; (4) SCHEDULING FURTHER HEARING ON ADEQUATE PROTECTION ISSUES; AND (5) GRANTING RELATED RELIEF** shall be served to the parties in the manner designated below:

By Electronic Service: I certify that the parties of record in this case as identified below, are registered CM/ECF users.

- Scott S Bridge    sbridge@keslerrust.com
- P. Matthew Cox    mw@scmlaw.com, ec@scmlaw.com
- Bret R Evans    brevans@swlaw.com, jritchie@swlaw.com,docket_slc@swlaw.com,awayne@swlaw.com
- Nickolas Karavolas    nkaravolas@phillipslytle.com
- Peter J. Kuhn    Peter.J.Kuhn@usdoj.gov, James.Gee@usdoj.gov;Lindsey.Huston@usdoj.gov;Rinehart.Peshell@usdoj.gov;Rachelle.D.Armstrong@usdoj.gov;Brittany.Eichorn@usdoj.gov
- David H. Leigh    dleigh@rqn.com, ASanchez@rqn.com;docket@rqn.com
- Darren B. Neilson    dneilson@parsonsbehle.com
- Mark C. Rose    mrose@mbt-law.com, markcroselegal@gmail.com
- Paul Norwood Jonas Ross    paul@paulnjrosslaw.com, ross.paulr102673@notify.bestcase.com
- Brian M. Rothschild    brothschild@parsonsbehle.com, ecf@parsonsbehle.com;docket@parsonsbehle.com
- D. Ray Strong tr    rstrong@thinkbrg.com, UT30@ecfcbis.com;drstrong@ecf.axosfs.com
- United States Trustee    USTPRegion19.SK.ECF@usdoj.gov

The following parties in interest are not registered ECF users and must be notified manually:

CFO Solutions, LLC dba Ampleō
13601 W McMillan Rd
#102 PMB 320
Boise, ID 83713

Dated this 3rd day of May, 2022.                **PARSONS BEHLE & LATIMER**

                                                /s/ Brian M. Rothschild
                                                Brian M. Rothschild

4869-1060-0990